STEEN v. WILD GOOSE MIN. CO.

(Second Division.   Nome.    October 28, 1901.)

No. 351.

1. MINES AND MINERALS—BOUNDARIES—NOTICE OF LOCATION.

Where there is a discrepancy between the courses and distances mentioned in the notice of location of a placer mining claim and the stakes and monuments set by the locator, the latter must prevail.   Section 682, Code Civ. Proc. (Act June 6, 1900, c. 786, 31 Stat. 440).

2. SAME—NOTICE OF LOCATION—CONSTRUCTION.

When the notice of location of a placer mine describes the claim as "commencing at the upper or north end of claim No. 4, thence running along the bed of the creek 1,500 feet, thence 300 feet east and west from the center stake," and there were two center stakes, one at each end, *held*, that the claim was correctly located as a parallelogram 1,500 feet long by 300 feet in width on each side of a straight line drawn from one center stake to the other, and not along the sinuosities of the stream.

This is an action by the plaintiff to quiet his title to bench claim No. 15 on Ophir creek, Eldorado mining district, Alaska.   He claims the property through a location made by him on the 28th day of January, 1901.   After alleging the discovery of gold, the posting, filing, and recording of the certificate of location, and describing his claim, he alleges that the defendant claims some interest in the property, and is in possession thereof, extracting gold therefrom, and prays that their respective claims may be adjudicated, and his title thereto quieted.

The defendant, answering, denies all the equities set up by the plaintiff; denies that the plaintiff made any discovery of gold on the premises; and for its first defense alleges title in itself through a senior location, made by one A. Karl-

son on the 31st day of May, 1898. It is alleged that Karlson made a discovery of gold, placed monuments to mark the boundaries, and filed and recorded his notice of location within the time prescribed by law; that ever since that time either Karlson or some of his grantees have been in possession of the claim, working upon and extracting gold therefrom; that on or about the 7th day of August, 1900, the defendant caused the claim to be surveyed according to the original stakes, and caused substantial stone monuments to be located at the four corners thereof; that at the time of making his claim in January, 1901, the plaintiff well knew that the defendant was in possession, working as a grantee under the Karlson location, and had buildings and other substantial improvements thereon; and generally alleges want of equity against the plaintiff.

For a second answer and defense, the defendant alleges that on the 15th day of September, 1899, one Henry Shuman located what is known as the "Ophir Flat Placer Mining Claim," which overlapped the Karlson claim, and included nearly all of that portion of the Karlson claim now in controversy between the plaintiff and the defendant; that by reason of the conflict between the Karlson claim and the Ophir Flat claim the defendant, about August 7, 1900, purchased the Ophir Flat claim from the grantees of Shuman, and has ever since remained in the possession thereof, and working the ground. It appears from the answer that the defendant claims title to the ground in controversy through both the Karlson and Shuman locations.

The plaintiff, in his reply, admits the Karlson location, but alleges that the survey made in August, 1900, by the defendant, embraced a tract not included within the original Karlson location certificate, and that it is upon the tract not included within the Karlson certificate that he has filed his bench claim No. 15. He admits the Shuman location on the

15th day of September, 1899, but alleges that for want of a definite description of courses it was void, and insufficient to reserve the ground from subsequent location.

J. W. Loman, for plaintiff.

Johnson & Daly, Sullivan & Fink, and Gordon Hall, for defendant.

WICKERSHAM, District Judge.   The case has been fully heard upon the merits, and the whole matter is now before the court for final determination.   From the evidence it appears that on May 21, 1898, Karlson, assisted by Englestadt, Helfberg, and others, located claims Nos. 15, 16, 17, and 18 on Ophir creek.   The evidence shows conclusively that the parties located the Karlson claim in relation to No. 14, previously located by one Brevig.   They began at Brevig's lower initial stake, and measured off the supposed distance of the Brevig claim, and there established the Karlson initial stake on the right bank of Ophir creek.   They then measured as near as they could in a straight course up the stream 1,500 feet, when, finding that the stake could not be located at that exact point on account of the accumulated ice, they set an upper end stake some distance further to the north, where it could be permanently fixed, and where it yet remains. There is some testimony by Englestadt that they found the upper initial stake of the Brevig location at the point where the initial stake of No. 15 was placed by Karlson.

In May, 1898, at Unalakleet, Karlson employed McDonald to set the corner stakes on claim No. 15.   Leonhurtz was employed to perform that labor, and in August, 1898, so he testifies, he set the corner stakes at both ends of Karlson's claim, beginning at the lower initial stake.   There is other evidence that other parties were employed to set the corner stakes of the Karlson claim also, and there seems to have

1 A.R.—17

been more than one attempt to set those corner stakes in compliance with the original location notice. The Golovin Bay Mining Company came into possession of the Karlson claim under a lease, and employed some 14 men in working and extracting gold therefrom, until, in July, 1900, the claim was sold to the defendant company, which entered into possession of it, and has ever since remained in possession. On August 7, 1900, it procured Englestadt and other parties, who were familiar with the original stakes, to assist in surveying and locating the ground according to the original stakes. The survey was begun at the initial stake of the Karlson claim. The center of Ophir creek was taken as the center line of the claim, and a stake some 50 or 60 feet east of the initial stake, which had been set there in 1898 by Leonhurtz for Karlson, was taken as the southeast corner, and from these two, with the center of Ophir creek as a base line, in connection with the original north center stake, which was yet standing, the surveyor located Karlson's claim No. 15 in the form of a parallelogram. In locating the claim 1,500 feet north from the lower initial stake, the surveyor discovered, as was expected, that the upper center stake was too far north, and the upper end stakes were set only 1,500 feet up stream from the lower initial stake, which caused the abandonment of all of the ground between the upper end stake, as surveyed, and the old upper center stake.

From all the evidence in the case I am satisfied that on August 7, 1900, the defendant did cause the Karlson claim to be fairly located upon the exact spot marked by the stakes theretofore set by Karlson and those whom he had employed to mark the ground. At that time the defendant was in possession of the ground, had buildings and a large force of men there at work, and continued to mine thereon up to the time when the plaintiff made his location of a portion of the same ground.

The whole difficulty in this case arises from the certificate of location, which reads as follows:

"Placer Mining Claim No. 15 Above on Ophir Creek.

"Notice is hereby given that the undersigned, having complied with the requirements of chapter 6, title 32 of the Revised Statutes of the United States, and the local customs, laws, and regulations, has this day located twenty acres of placer mining ground on Ophir creek, Eldorado mining district, N. W. Alaska, and described as follows:   Commencing at the upper or north end stake of claim No. 14, thence running along the bed of the creek 1,500 feet, thence 300 feet east and west from the center stake.

"Located May 21, 1898.                    A. Karlson, Locator.
"Recorded May 23, 1898.
   "A. T. Mordaunt, Recorder."

On January 28, 1901, the plaintiff, noting the fact that the certificate of location called for the lines of No. 15 to run up the bed of the creek 1,500 feet, thence 300 feet east and west from the center stake, determined that, because claim No. 15 has been finally surveyed and staked in the form of a parallelogram, instead of following the sinuosities of the bed of Ophir creek, it was, therefore, void as to all the ground more than 300 feet distant from the center of Ophir creek. He thereupon located that portion of the claim No. 15, then in the possession of the defendant, which he thought to be more than 300 feet distant from the center of Ophir creek.

The dispute arises over that portion of No. 15 lying more than 300 feet west of the center line of Ophir creek, and between that line and the west line of the claim.   This would include the buildings of the defendant and its most valuable mine workings.   The question for determination by the court is whether or not claim No. 15 shall be sustained as originally staked by Karlson and those who staked for him, and as surveyed and staked by the defendant in August, 1900.

It is apparent that there is a discrepancy between the courses mentioned in the Karlson location notice and the

monuments set by Karlson and his employés, and reset after
the survey by the defendant in August, 1900. It appears
from the evidence that, at the time when the original stakes
of the Karlson claim were set the valley of Ophir creek was
yet filled with the snow and ice of the previous winter, and
that it was impossible at that time to determine with any ac-
curacy the exact location of the stream. It is in evidence,
however, that Karlson sought to make his location in the
form of a parallelogram directly up stream along the valley
where the claim is now located, seeking to keep to the left
of a prominent rocky bluff, which he desired to avoid. The
monuments set by him at that time, and the corner stakes
afterwards set by his employés, and the monuments set by
the defendant upon the survey in August, 1900, all located
the claim in accordance with that general idea. The plaintiff
now insists, however, that all those locations are mistaken,
because they did not follow the sinuosities of the creek. Such
a construction is not necessary from the language of the
location certificate itself, and especially when it is considered
that at the time that the notice was written it was impossible
for Karlson to know where the creek was located, and that
his only idea was to take a parallelogram up stream across
the valley, avoiding the rocky bluff on the right hand.

Apply the rule of construction demanded by the plaintiff
to his own location certificate, and it, too, would be in-
definite and void. It begins 300 feet west of Karlson's initial
stake, and the two first courses are as follows: "Then fol-
lowing the western boundary of No. 15 creek claim, as lo-
cated and recorded by A. Karlson in 1898, for 1,300 feet up
stream, thence 660 feet in a westerly direction." If, now,
we attempt to fit these courses to the stakes set by Steen
and shown on his map Exhibit A, it will be seen that the
same difficulties arise as those urged by plaintiff to Karlson's
notice. In the Karlson case the plaintiff insists that the no-

tice of location describes a sinuous line. If that is true, is it not true that the Steen notice also describes the same sinuous line for his east boundary? If the plaintiff succeeds on that point, he goes out of court upon his own certificate, for in that description it is the Karlson certificate repeated.

The Karlson notice commences at the upper or northern end of claim No. 14, thence running along up the bed of the creek 1,500 feet, and thence 300 feet east and west from the center stake. Two things are certain from this notice. The first is that there was an upper and lower stake; and the second is that the claim is to be 300 feet on each side of a line drawn from the upper to the lower stake. The plaintiff insists that this line is a sinuous one, while the defendant insists that it is to be straight. From the evidence in this case it is clear to the court that Karlson's intention was that it was to be straight. He drew a straight line at the time of his original staking from the lower to the upper stake. Those whom he employed to set the corner stakes have testified that these were set with a view of making the claim a parallelogram. The resetting of these stakes in August, 1900, was in the form of a parallelogram, and from all the evidence in the case I am satisfied that every person who set any stakes upon this claim from the first location in 1898 to the survey in 1900 set them with a view of making the claim a parallelogram, and not sinuous or snake-like. The court will not shut its eyes, either, to the fact that every claim on Ophir creek is a parallelogram, including those immediately above and below the one in question. While the act of Karlson in setting his stakes in the form of a parallelogram may not be taken to contradict the plain language of his location notice, yet it is of some service to the court in determining the construction of its language when a question arises about it. The similar construction of every location certificate along Ophir creek is also of assistance to the

court.   It would be ruinous to the best interests of this region if the court should refuse to recognize this contemporaneous construction of these location notices by the miners themselves.   Such a local construction has been given to similar notices along Ophir and other creeks, and in every case that construction has been consistent with the one given by Karlson and the defendant in this case.   The court will not overturn that construction for the purpose of forfeiting a title acquired in good faith and for a valuable consideration.   It will not enforce a different construction for the purpose of taking one man's property, for which he has paid value received, and upon which he has expended large sums of money, that it may be given to another man, whose claim is wholly without either law or equity to support it.   This determination finds abundant authority in the law.   Section 682 of the Code of Civil Procedure, contained in the act of June 6, 1900, c. 786, 31 Stat. 440, lays down these rules for construing the descriptive part of a conveyance of real property when the construction is doubtful, and there are no other sufficient circumstances to determine it:

"First. Where there are certain definite and ascertained particulars in the description, the addition of others which are indefinite, unknown, or false does not frustrate the conveyance, but it is to be construed by such particulars, if they constitute a sufficient description to ascertain its application.

"Second. When permanent and visible or ascertained boundaries or monuments are inconsistent with the measurement, either of lines, angles, or surfaces, the boundaries or monuments are paramount."

While the location notice in this case is not a conveyance in the strict sense, yet it is the foundation of a conveyance from the government, and the same rule may be adopted in construing it.   Now, there are in this certificate at least two definite and ascertained particulars, to wit, the

upper and lower initial stakes, and the 300 feet east and west. These definite and ascertained particulars in the description are sufficient, taken in connection with the construction given by Karlson and all of his employés, to fix the form of the mining claim in question, and the court will not permit that which is definite and certain to be destroyed by that which is indefinite and uncertain.

In accordance with the second rule, the court will accept the permanent and visible boundaries set by Karlson and his employés as the real description of the property, and will reject the doubtful effort to fix a sinuous line, even if such were ever intended. The plain good sense of a certificate of this kind has not given the miners of Ophir creek any trouble. Upon exactly similar location notices they have uniformly located a parallelogram upon the line of the creek from initial stake to initial stake; and this court will not overturn what thus appears to be a fair compliance with the correct rules for construing a location notice of that kind.

A question similar to this seems to have arisen in the case of Book v. The Justice Mining Company (C. C.) 58 Fed. 106. The court in that case said:

"But it is argued that the locations are invalid because notices were posted that did not correctly describe the lode, and because the notices were not posted on the lode. In construing notices of this character, where, under the mining rules and local regulations or state laws, such notices are required to be posted on the ground, the courts are naturally inclined to be exceedingly liberal in their construction. Such notices are often drawn by practical miners, unaccustomed to legal forms and technical phraseology; hence the language used in the notices is often subject to more or less criticism by counsel learned in the law, and engaged in preparing documents in legal shape and form. Then, again, locations are often made without any accurate knowledge of the true course and directions which a compass would readily give, and mistakes in the notice as to the direction and course of the ground located often occur. But such mistakes do not invalidate the location. Positive exactness in

such matters should never be required. It is the marking of the location by posts and monuments that determines the particular ground located." Book v. Justice Min. Co. (C. C.) 58 Fed. 106; McEvoy v. Hyman (C. C.) 25 Fed. 596; 1 Lindley on Mines, § 382.

Upon all the evidence in this case I am satisfied that the Karlson location is a valid one; that the monuments fixed by the survey made by the defendant on August 7, 1900, should be sustained, for the reason that they are approximately, if not exactly, in accordance with the prior staking of the claim by Karlson and his employés, except as to the north end, where monuments or stakes could not be set as far north as the original stakes, for the reason heretofore given. I am satisfied with the common-sense construction given by the miners of Ophir creek to location notices of this kind. Their construction is in accordance with the well-established rules of law, and will be sustained by the court in this case.

A decree may be entered in this case denying the prayer of the plaintiff, and adjudging the defendant to be the owner of all the property in question within the limits of the Karlson claim as surveyed by the defendant on August 7, 1900. So far as the Steen claim overlaps and conflicts with the Karlson claim as surveyed, it is void, and of no effect.